2006 ND 178

**Jay GABEL, Plaintiff and Appellee**

v.

**NORTH DAKOTA DEPARTMENT OF TRANSPORTATION, Defendant and Appellant.**

**No. 20060003.**

Supreme Court of North Dakota.

Aug. 16, 2006.

Jodi L. Colling (argued) and Thomas A. Dickson (on brief), Dickson Law Office, Bismarck, ND, for plaintiff and appellee.

Zachary E. Pelham (argued), Assistant Attorney General, Office of Attorney General, Bismarck, ND, for defendant and appellant.

KAPSNER, Justice.

[¶ 1] The North Dakota Department of Transportation ("Department") appeals from a district court judgment reversing a hearing officer's decision to suspend Jay Gabel's driving privileges for ninety-one days. We affirm the district court judgment.

I

[¶ 2] On April 23, 2005, a dispatcher at the Stutsman County Sheriff's Office sent a radio message to Officer Elizabeth Kapp stating that Chad Steele had reported a vehicle traveling on Highway 281 south of Jamestown that would speed up and slow down, not allowing Steele to pass. Steele also reported the license plate of the vehicle was "JAYBIRD." Steele continued to follow the driver relaying his location to the dispatcher on his cell phone. Steele's information was relayed from the dispatcher to Officer Kapp. The record does not reflect how many times Steele attempted to pass, what the road conditions were, how long Steele had been following Gabel, or at what speed Steele was attempting to pass Gabel's vehicle.

[¶ 3] Officer Kapp passed Steele's vehicle and located Gabel's vehicle. Officer Kapp measured the speed of Gabel's vehicle at 47 miles per hour in a 65 mile per hour zone. There was no posted minimum speed limit in the area. After determining the vehicle's speed, Officer Kapp stopped Gabel's vehicle based on the information she received from the dispatcher. Officer Kapp did not report independently viewing a traffic violation. Her testimony indicates she did not observe erratic or suspicious driving. Officer Kapp testified she had not noticed Gabel cross the center line, drive on the shoulder, or commit any moving violation. Officer Kapp stated the stop was based on Steele's report that Gabel had previously sped up in his own lane, making it difficult for Steele to pass.

[¶ 4] When stopped, Gabel stated he was recently married. He admitted he had been drinking. Officer Kapp testified she administered several field sobriety tests with Gabel failing each test. Officer Kapp then arrested Gabel for driving under the influence of alcohol.

[¶ 5] At the administrative hearing, Gabel claimed Officer Kapp lacked a reasonable and articulable suspicion to justify the traffic stop of his vehicle. Gabel argued a case decided by this Court a day before the administrative hearing precluded the officer from stopping Gabel. *See*

*Anderson v. Director, N.D. Dep't of Transp.*, 2005 ND 97, 696 N.W.2d 918. The hearing officer concluded the facts in *Anderson* were distinguishable from the facts in this case because in this case the informant was known by the arresting officer. Gabel's driver's license was subsequently suspended.

[¶ 6] Gabel appealed the hearing officer's decision to the district court arguing that *Anderson* controlled and the officer did not have an independent basis to support the traffic stop. The district court reversed the hearing officer's decision, concluding the officer did not have the requisite reasonable and articulable suspicion to stop Gabel's vehicle. On appeal, the Department argues the identity of the informant was known by the officer and incriminating information was relayed from the dispatcher to the officer making this case distinguishable from *Anderson*.

## II

■ [¶ 7] Our review of a decision to suspend a driver's license is governed by N.D.C.C. ch. 28–32. *Anderson*, 2005 ND 97, ¶ 6, 696 N.W.2d 918. We review the record before the administrative agency and will affirm an agency's decision unless:

1. The order is not in accordance with the law.

2. The order is in violation of the constitutional rights of the appellant.

3. The provisions of this chapter have not been complied with in the proceedings before the agency.

4. The rules or procedure of the agency have not afforded the appellant a fair hearing.

5. The findings of fact made by the agency are not supported by a preponderance of the evidence.

6. The conclusions of law and order of the agency are not supported by its findings of fact.

7. The findings of fact made by the agency do not sufficiently address the evidence presented to the agency by the appellant.

8. The conclusions of law and order of the agency do not sufficiently explain the agency's rationale for not adopting any contrary recommendations by a hearing officer or an administrative law judge.

N.D.C.C. § 28–32–46.

■ [¶ 8] We give deference to the Department's sound findings, but review questions of law de novo. *Bjerklie v. Workforce Safety and Ins.*, 2005 ND 178, ¶ 9, 704 N.W.2d 818; *Gray v. N.D. Game and Fish Dep't*, 2005 ND 204, ¶ 7, 706 N.W.2d 614. In this appeal, the issue before this Court is a question of law, namely whether there existed a reasonable and articulable suspicion for Officer Kapp to stop Gabel's vehicle.

■ [¶ 9] To justify the stop of a moving vehicle for investigation, an officer must have a reasonable and articulable suspicion the motorist has violated or is violating the law. *City of Fargo v. Ovind*, 1998 ND 69, ¶ 8, 575 N.W.2d 901. The flexible and fact specific inquiry into reasonable and articulable suspicion is not readily, or even usefully, reduced to a neat set of legal rules. *State v. Loh*, 2000 ND 188, ¶ 5, 618 N.W.2d 477. We have recognized "the test of reasonableness under the Fourth amendment requires careful attention to the severity of the crime." *State v. Anderson*, 2006 ND 44, ¶ 24, 710 N.W.2d 392 (citing *State v. Heitzmann*, 2001 ND 136, ¶ 18, 632 N.W.2d 1). Nevertheless, observed traffic violations provide officers with the requisite suspicion for conducting investigatory stops. *Loh*, at ¶ 10. The validity of a stop is evaluated under an

objective standard considering the totality of the circumstances. *Ovind*, at ¶ 8.

[¶ 10] Both the hearing officer and the district court concluded this case was governed by *Anderson v. Director, N.D. Dep't of Transp.*, 2005 ND 97, 696 N.W.2d 918, although reaching different conclusions. In *Anderson*, the Cass County Sheriff's Office received a report about a "possible reckless driver or drunk driver" that had hit cones in a construction zone. *Id.* at ¶ 2. The informant continued to follow the driver until the deputy reached the vehicle. *Id.* at ¶ 3. The deputy followed Anderson for two miles without observing any illegal or erratic driving before the stop. *Id.* The informant's name was not relayed to the officer although the informant had been pulled to the side of the road and was being interviewed by an assisting officer. *Id.* at ¶ 4. The record was "unclear whether the deputy learned of the construction zone allegation before he stopped Anderson." *Id.* The Department suspended Anderson's license, but the district court reversed because the arresting officer did not have reasonable and articulable suspicion necessary to support the stop. *Id.* We affirmed the district court's decision because the "deputy was not acting on a directive from another officer and he did not directly observe illegal activity. Here, the deputy only received information from the dispatcher." *Id.* at ¶ 9. We explained the tip was likely reliable or could eventually have become reliable and that the reliability of a tip was to be based on a sliding scale: "As the reliability of the tip moves up on the scale, the quantity of the information sufficient to raise a reasonable and articulable suspicion is less." *Id.* at ¶ 18 (citing *State v. Miller*, 510 N.W.2d 638, 640 (N.D.1994)). But in *Anderson*, even though the tip was or could have been sufficiently reliable, the Department failed "to establish that the informant told the dispatcher the suspect hit cones in a construction zone and that the dispatcher gave that information to the deputy." *Id.* at ¶ 19. The "bare assertion" of a "possible reckless driver or drunk driver" was not sufficient to justify the stop. *Id.* at ¶ 21.

[¶ 11] To determine whether an officer has a reasonable and articulable suspicion, we examine the information known to the officer at the time of the stop and information imputed to the officer based on another officer's directive to make a stop. *State v. Boyd*, 2002 ND 203, ¶ 15, 654 N.W.2d 392; *City of Devils Lake v. Lawrence*, 2002 ND 31, ¶ 9, 639 N.W.2d 466 (recognizing that when one officer directs another officer to effectuate a stop without relaying the underlying facts and circumstances, the directing officer's knowledge is imputed to the acting officer). An officer can use information received from other officers with his or her personal observations to form the factual basis needed for a legal investigatory stop. *Boyd*, at ¶ 16. We have upheld investigatory stops of vehicles when the stopping officer received information of illegal activity from other officers and the officer corroborated the tip with personal observations. *State v. Kenner*, 1997 ND 1, ¶ 12, 559 N.W.2d 538. If the surrounding facts and circumstances verify an informant's reliability, a known informant's tip can provide a sufficient basis to justify a stop. *Miller*, 510 N.W.2d at 640–41 (citing *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)).

[¶ 12] Officer Kapp testified she knew the informant in her "professional capacity"; she believed he had a criminal record. We have allowed tips from known criminal informants to justify a stop provided the tip is otherwise reliable. *State v. Anderson*, 2006 ND 44, ¶¶ 13, 17, 710 N.W.2d 392. "As a general rule, the lesser

the quality or reliability of the tip, the greater the quantity of information required to raise a reasonable suspicion." *Id.* at ¶ 13 (quoting *Miller,* 510 N.W.2d at 640). "In evaluating the factual basis for an investigatory stop, we must consider the totality of the circumstances, including the quantity, or content, and quality, or degree of reliability, of the officer's information." *Id.* Here, the content and quality of the officer's information when she made the stop was insufficient to justify a stop of Gabel's vehicle. The officer was only able to corroborate the location of the vehicle and its license plate but unable to corroborate any illegal activity or other suspicious activity that would confirm the reliability of Steele's tip. There is nothing from the record in this case that ensures the informant was reliable. Officer Kapp did not testify about the informant's reliability. Given her testimony, there is nothing in this record to suggest Officer Kapp regarded Steele as other than a member of the "criminal milieu." Members of the "criminal milieu" must have their reliability established. *Id.* at ¶ 15. However, we need not determine the reliability of Steele, because, even assuming he was a reliable informant, his tip of a vehicle speeding up and slowing down, not allowing a car to pass is insufficient to support a traffic stop absent corroboration of otherwise illegal activity or suspicious conduct. Driving on a highway slightly below the speed limit is not sufficiently suspicious to support a traffic stop.

[¶ 13] The Department argues this case is stronger than *Anderson v. Director, N.D. Dep't of Transp.,* 2005 ND 97, 696 N.W.2d 918 because the information relayed to the officer was more specific and provided the officer with evidence of a traffic violation. Officer Kapp testified she observed Gabel driving below the posted speed limit, but she did not notice Gabel cross the center line, drive on the shoul-

der, or commit any moving violation. The Department does not argue that Gabel's speed of 47 miles per hour in a 65 mile per hour zone provides a sufficient basis to justify a stop. *See, e.g., Johnson v. Sprynczynatyk,* 2006 ND 137, ¶ 13, 717 N.W.2d 586 (traveling 8–10 miles per hour in a 25 mile per hour zone does not constitute reasonable and articulable suspicion to support a stop); *State v. Brown,* 509 N.W.2d 69, 71 (N.D.1993) (evidence that driver is traveling at slower than usual speed does not create reasonable and articulable suspicion); *Salter v. North Dakota Dep't of Transp.,* 505 N.W.2d 111, 114 (N.D.1993) (officer did not have reasonable and articulable suspicion to stop a car traveling 30–35 miles per hour in a 50 mile per hour zone even though the car was weaving slightly within own lane).

[¶ 14] The basis of the Department's argument is that a traffic violation occurred. As authority for this conclusion, the Department cites N.D.C.C. § 39–10–11(2), which states: "the driver of an overtaken vehicle shall give way to the right in favor of the overtaking vehicle on audible signal and may not increase the speed of that driver's vehicle until completely passed by the overtaking vehicle." Based on the record we have before us, it is not entirely clear the information Steele conveyed amounted to a violation of this statute. There was no information to suggest Steele made an "audible signal" that he intended to pass. The record we have is limited to Officer Kapp's testimony:

> MR. SHARP: What information did you receive out in the patrol car?
>
> DEPUTY KAPP: That the vehicle, JAYBIRD, would speed up, slow down, would not allow Mr. Steele to pass him.
>
> . . .
>
> MR. DICKSON: You never noticed any crossing of the center line or any driving

on the shoulder or anything like that. Isn't that correct?

DEPUTY KAPP: No.

MR. DICKSON: Okay. You never noticed ... you, yourself, never noticed any moving violations, did you?

DEPUTY KAPP: Other then I locked him in on radar 47 in a 65.

MR. DICKSON: And there's no minimum speed on that highway, is there?

DEPUTY KAPP: If there's traffic behind him, he's impeding traffic.

MR. DICKSON: Officer, there's no minimum speed on that highway, is there?

DEPUTY KAPP: No, not that I recall.

[¶ 15] Officer Kapp testified she did not observe a traffic violation. The sole reason Officer Kapp gave for justifying the stop was based on Steele's report that Gabel had previously sped up in his own lane, making it difficult for Steele to pass. Officer Kapp testified that this unverified report provided her with sufficient information that Gabel was an impediment to traffic. Officer Kapp did not independently observe or corroborate Gabel speeding up and slowing down nor did she view Gabel impede the ability of others to pass his vehicle. Based upon the information conveyed, there is only a possibility that a violation had occurred. This is the functional equivalent of the "possible reckless driver or drunk driver" held to be insufficient to establish a reasonable and articulable suspicion in *Anderson*, 2005 ND 97, ¶ 21, 696 N.W.2d 918.

### III

[¶ 16] We conclude, under the totality of the circumstances, Officer Kapp did not have a reasonable and articulable suspicion to justify the stop of Gabel's vehicle. We affirm the district court's judgment reinstating Gabel's driving privileges.

[¶ 17] GERALD W. VANDE WALLE, C.J., MARY MUEHLEN MARING, and DANIEL J. CROTHERS, JJ., concur.

SANDSTROM, Justice, dissenting.

[¶ 18]I respectfully dissent. The tip the officer received was reliable and specific. Therefore, the traffic stop was justified. Although the majority ultimately declares them to be dicta, the majority's statements obscure established Fourth Amendment jurisprudence, blurring the standards between a citizen informant and a criminal informant and between reasonable suspicion and probable cause. Then, in its penultimate paragraph, the majority returns to what it has told us does not matter in order to erroneously conclude that because the officer did not corroborate the tip, the stop was not justified. I would affirm.

### I

[¶ 19] The majority misstates the standard of review in administrative appeals. At ¶ 8, citing *Bjerklie v. Workforce Safety and Ins.*, 2005 ND 178, ¶ 9, 704 N.W.2d 818, and *Gray v. N.D. Game and Fish Dep't*, 2005 ND 204, ¶ 7, 706 N.W.2d 614, the majority says, "We give deference to the Department's sound findings, but review questions of law de novo." But that is not the standard enunciated in either *Bjerklie* or *Gray*. The majority's attempt to limit deference to "sound findings" is inconsistent with this Court's jurisprudence ever since the standard—based on constitutional separation of powers—was set forth in *Power Fuels v. Elkin*, 283 N.W.2d 214, 222 (N.D.1979):

> In construing the "preponderance of the evidence" standard to permit us to apply the weight-of-the-evidence test to the factual findings of an administrative agency, we do not make independent findings of fact or substitute our judgment for that of the agency. We deter-

mine only whether a reasoning mind reasonably could have determined that the factual conclusions reached were proved by the weight of the evidence from the entire record.

## II

[¶ 20] "The reasonable and articulable suspicion standard requires more than a 'mere hunch,' but less than probable cause." *Lapp v. N.D. Dep't of Transp.,* 2001 ND 140, ¶ 11, 632 N.W.2d 419. " 'Reasonable suspicion to justify a stop exists when "a reasonable person in the officer's position would be justified by some objective manifestation to suspect potential criminal activity." ' " *Kappel v. Dir., N.D. Dep't of Transp.,* 1999 ND 213, ¶ 7, 602 N.W.2d 718 (quoting *City of Fargo v. Ovind,* 1998 ND 69, ¶ 8, 575 N.W.2d 901). "[T]he reasonable suspicion standard does not require an officer to see a motorist violating a traffic law or to rule out every potential innocent excuse for the behavior in question before stopping a vehicle for investigation." *Id.* at ¶ 10.

[¶ 21] "As the reliability of the tip moves up on the scale, the quantity of the information sufficient to raise a reasonable and articulable suspicion is less." *Anderson v. Dir., N.D. Dep't of Transp.,* 2005 ND 97, ¶ 18, 696 N.W.2d 918. In the context of an anonymous informant's tip, "our cases have required that the officer corroborate the tip by observing some behavior on the part of the driver, either illegal or indicative of impairment, that alerts the officer to a possible violation." *State v. Miller,* 510 N.W.2d 638, 642 (N.D. 1994). In the context of a known informant's tip, however, our cases have held that the information a tip provides can itself be sufficient to raise a reasonable and articulable suspicion. *Miller,* at 640–41. As the United States Supreme Court said in *Adams v. Williams:*

In reaching this conclusion, we reject respondent's argument that reasonable cause for a stop and frisk can only be based on the officer's personal observation, rather than on information supplied by another person. Informants' tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability. One simple rule will not cover every situation. Some tips, completely lacking in indicia of reliability, would either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized. But in some situations—for example, when the victim of a street crime seeks immediate police aid and gives a description of his assailant, or when a credible informant warns of a specific impending crime—the subtleties of the hearsay rule should not thwart an appropriate police response.

407 U.S. 143, 147, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

## III

[¶ 22] The majority argues that because the informant had a criminal record, implying he was a member of the "criminal milieu," Officer Kapp had to corroborate the known informant's tip before she could have a reasonable and articulable suspicion. The majority states, at ¶ 12, "Officer Kapp testified she knew the informant in her 'professional capacity'; she believed he had a criminal record." In misdirected dicta in *State v. Anderson,* the opinion differentiated between a member of the "criminal milieu" and a citizen informant. 2006 ND 44, ¶ 15, 710 N.W.2d 392. "A member of the 'criminal milieu' is someone 'who is himself involved in criminal activity or is, at least, someone who enjoys the confidence of criminals.' " *Id.* (quoting *State v. Dahl,* 440 N.W.2d 716, 718 (N.D. 1989)). But *Dahl* related to probable

cause, not reasonable suspicion. *Anderson* did not discount reasonable suspicion because of the so-called "criminal milieu" argument. The majority is unable to cite any case in the United States in which a tip from a known informant discounted reasonable suspicion because a known informant was part of the "criminal milieu." Nor can the majority cite any other case in the United States that says a "criminal record," without more, equals being part of the "criminal milieu." We said, however, that a citizen informant is someone who volunteers the information, seeks nothing in return, and is not at risk or in fear of going to jail. *Id.* Although we did not need to decide whether the informant was a member of the "criminal milieu" or a citizen informant, *Id.* at ¶ 16, we held the informant was reliable because of the quality of his information:

> Greg's information has a higher indicia of reliability because he was a known informant who voluntarily gave Deputy Gress information on prior occasions. Deputy Gress testified that, except for the one occasion, Greg was always truthful. The information Greg gave in this case also had a higher indicia of reliability because Greg was in Jamestown and the information involved events in Fargo, which Officer Crane verified. Greg volunteered the information knowing his son, Daniel, could be arrested if law enforcement learned about Jesse and Daniel's plan. Greg contacted Deputy Gress because he was worried about Jesse and Daniel's safety and he wanted Deputy Gress' help. Greg did not ask for anything in exchange for the information, and he was not at risk of going to jail in connection with this incident.

*Id.* at ¶ 17.

[¶ 23] Applying the facts of the present case to the definition of "criminal milieu" and citizen informant, this case's informant is a citizen informant. He volunteered the information. The record contains no evidence that he somehow sought something in return for the tip. Finally, he was at no risk of going to jail, unless he made a false report to law enforcement. The record contains no evidence that the informant was presently involved in criminal activity or enjoyed the confidence of criminals. Therefore, to imply that Mr. Steele was somehow a member of the "criminal milieu," thus requiring validation of his tip, is baffling. The record does not contain any evidence of what his criminal history was. The majority has basically categorized all informants with a criminal past into the "criminal milieu" without consideration of what the criminal past is or how that past is relevant to the case at hand. The logical conclusion of this premise is that anyone with a criminal past, no matter how long ago or how irrelevant, cannot be a citizen informant. The majority, at ¶ 12, states, "The officer was only able to corroborate the location of the vehicle and its license plate but unable to corroborate any illegal activity or other suspicious activity that would confirm the reliability of Steele's tip." Corroboration in this case is not required, because the tip was from a known citizen informant, not a member of the "criminal milieu." The tip provided sufficient information to give Kapp a reasonable and articulable suspicion.

[¶ 24] The majority is also inconsistent in its conclusions. At ¶ 12, the majority first states, "Here, the content and quality of the officer's information when she made the stop was insufficient to justify a stop of Gabel's vehicle." Five sentences later, however, the majority tells us that it is all dicta, stating, "we need not determine the reliability of Steele, because, even assuming he was a reliable informant, his tip of a vehicle speeding up and slowing down, not allowing a car to pass is insufficient to support a traffic stop absent corroboration

of otherwise illegal activity or suspicious conduct." The majority answered the question of whether the informant was reliable in the negative when it said the quality of the information was insufficient. Validation of the tip is required when the reliability, *i.e.*, the quality of the information is poor. *See Anderson*, 2006 ND 44, ¶ 13, 710 N.W.2d 392 (emphasis added) ("In evaluating the factual basis for an investigatory stop, we must consider the totality of the circumstances, including the quantity, or content, and *quality, or degree of reliability*, of the officer's information.").

[¶ 25] The majority, at ¶ 15, states, "Officer Kapp did not independently observe or corroborate Gabel speeding up and slowing down nor did she view Gabel impede the ability of others to pass his vehicle." The majority again confuses the standards that apply to a citizen informant and a criminal informant and to a known informant and an anonymous tip. Officer Kapp could base her reasonable and articulable suspicion on the information provided by the informant. Furthermore, the majority, at ¶ 15, states, "Based upon the information conveyed, there is only a possibility that a violation had occurred. This is the functional equivalent of the 'possible reckless driver or drunk driver' held to be insufficient...." Under the reasonable-suspicion standard, however, a "possibility" of a violation is all that is required as long as " 'a reasonable person in the officer's position would be justified by some objective manifestation to suspect potential criminal activity.' " *Kappel*, 1999 ND 213, ¶ 7, 602 N.W.2d 718 (quoting *Ovind*, 1998 ND 69, ¶ 8, 575 N.W.2d 901). The majority has confused the standards for a known citizen informant and a criminal informant.

## IV

[¶ 26] The majority wrongly concludes that this case is indistinguishable from *Anderson v. Dir., N.D. Dep't of Transp.*, 2005 ND 97, 696 N.W.2d 918. This case is different from *Anderson*, in which the report communicated to the officer, "possible reckless driver or drunk driver," was conclusory in nature, lacking any specified conduct. As in *Anderson*, the tip in this case was reliable. *See Anderson*, at ¶ 18 (the tip was of greater reliability because "the deputy was aware before the vehicle stop that the informant could be identified because dispatch had described the informant's vehicle to him, and in addition, he observed the informant's vehicle pull over as he stopped Anderson and he knew an assisting officer was interviewing the informant"). Here, the dispatcher communicated the informant's name and information to Officer Kapp. Officer Kapp knew who the informant was, allowing her to measure the tip's credibility. Also, the informant was following Gabel's car, was providing more information to the dispatcher, and was available to be interviewed after the traffic stop was made. Thus, the tip was of greater reliability. In this case, unlike in *Anderson*, however, the information relayed to the dispatcher and Officer Kapp was far more specific, providing the officer with a reasonable and articulable suspicion. *See id.* at ¶ 21 ("the communication by the dispatcher to the deputy of the bare assertion of a 'possible reckless driver or drunk driver,' is not of sufficient quantity to provide the reasonable and articulable suspicion sufficient to justify the stop of Anderson's vehicle"). Here, Officer Kapp was told that "the vehicle, JAYBIRD, would speed up, slow down, [and] would not allow Mr. Steele to pass him." This information addressed specific conduct, lending more reliability to the informant's tip. The conduct also described a specific type of erratic driving: impeding a faster moving car's lawful pass. Section 39–10–11(2), N.D.C.C., specifically requires

that an overtaken car allow a faster moving car to pass:

> Except when overtaking and passing on the right is permitted, the driver of an overtaken vehicle shall give way to the right in favor of the overtaking vehicle on audible signal and may not increase the speed of that driver's vehicle until completely passed by the overtaking vehicle.

The majority attempts to ignore this specific, erratic driving by stating, at ¶ 14, "Based on the record we have before us, it is not entirely clear the information Steele conveyed amounted to a violation of this statute. There was no information to suggest Steele made an 'audible signal' that he intended to pass." The fact that every element of the violation may not have been met, however, is irrelevant when measuring Officer Kapp's reasonable and articulable suspicion, because she was not required to know, for a fact, that Gabel had committed a violation. Her job was to respond to a known informant's specific tip of erratic driving. When Officer Kapp arrived, she observed Gabel driving forty-seven miles per hour in a sixty-five mile-per-hour zone. If "JAYBIRD" was speeding up and slowing down, a slow speed would logically be suspicious conduct to corroborate the tip. Steele's tip was more than the "functional equivalent" of the tip in *Anderson.*

### V

[¶ 27] Ultimately, Officer Kapp was given a specific, reliable tip from a known informant. Upon arriving at the scene, Officer Kapp observed Gabel driving forty-seven miles per hour in a sixty-five mile-per-hour zone, which, although not illegal, is unusual and would logically be the conduct that might be observed if someone were driving slowly, speeding up to prevent a pass, and then slowing down again. One cannot logically expect, however, that Gabel would continue speeding up to prevent a pass after an officer had arrived on the scene. Therefore, corroboration of the exact conduct Gabel was accused of, in addition to being unnecessary, was unlikely to happen. Officer Kapp did not have to corroborate the tip or observe illegal conduct to have a reasonable and articulable suspicion; the reliable tip alone was enough.

### VI

[¶ 28] I would reverse the district court and reinstate the Department's order.

[¶ 29] Dale V. Sandstrom