Filed 12/1/99 by Clerk of Supreme Court

IN THE SUPREME COURT

STATE OF NORTH DAKOTA

1999 ND 213

Kenneth Robert Kappel, Petitioner and Appellant

v.

Director, ND Department of

Transportation, Respondent and Appellee

No. 990142

Appeal from the District Court of Grand Forks County, Northeast Central Judicial District, the Honorable Kirk Smith, Judge.

AFFIRMED.

Opinion of the Court by VandeWalle, Chief Justice.

Henry H. Howe, Howe & Seaworth, 421 DeMers Avenue, Grand Forks, ND 58201, for petitioner and appellant.

Andrew Moraghan, Assistant Attorney General, Attorney General’s Office, 900 East Boulevard Avenue, Bismarck, ND 58505-0041, for respondent and appellee.

Kappel v. Dir., Dept. of Transportation

No. 990142

VandeWalle, Chief Justice.

[¶1] Kenneth Kappel appealed from a district court judgment affirming the North Dakota Department of Transportation’s (“Department”) 91-day suspension of Kappel’s driving privileges.  We affirm.[¶2] On July 25, 1998 at 12:57 A.M., Officer Troy Vanyo, who was traveling east on Seventh Avenue South in Grand Forks, observed a motorcycle stopped at a stop sign at the intersection of Seventh Avenue South and South 14
th
 Street.  Although Officer Vanyo saw no traffic coming from either direction, the motorcycle remained at the stop sign for an extended period of time.  In his report, Vanyo estimated Kappel paused for about ten seconds.  When Officer Vanyo first saw the stopped motorcycle he was two or three blocks from the intersection, but the motorcycle remained at the intersection until Officer Vanyo was 20 feet behind the motorcycle.  The motorcycle turned right onto South 14
th
 Street and Officer Vanyo followed, observing the motorcycle weaving several times within its own lane between the 800 and 1000 block of South 14
th
 Street.  Vanyo stopped the motorcycle.

[¶3] Vanyo observed Kappel staggered a bit and had poor balance when he got off the motorcycle.  Vanyo detected the odor of alcohol on Kappel’s breath and noticed his slurred speech.  Kappel admitted to Vanyo he had consumed nine beers.  After Vanyo administered several sobriety tests all of which Kappel failed,  Kappel was arrested for driving under the influence.  

[¶4] Kappel  requested and received an administrative hearing.  The hearing officer found Officer Vanyo observed the motorcycle pausing longer than normal at the intersection and later observed the motorcycle weaving within its own lane.  The hearing officer concluded Officer Vanyo had “a reasonable and articulable suspicion” that Kappel was driving under the influence.  

[¶5] Kappel appealed the decision to the district court.  The district court affirmed, concluding the longer than normal pause at the intersection and the later weaving together were enough to constitute a reasonable and articulable suspicion justifying the stop of Kappel. 

[¶6] Our review of an appeal from a district court decision on a license suspension is governed by the Administrative Agencies Practice Act.  Chapter 28-32, N.D.C.C.  We review the record compiled and decision rendered by the agency, not the decision of the district court.  
Dworshak v. Moore
, 1998 ND 172, ¶ 6, 583 N.W.2d 799.  We must affirm the agency’s decision unless:

1) a preponderance of the evidence does not support the agency’s findings;  2) the agency’s findings of fact do not support its conclusions of law and its decision;  3) the agency’s decision violates the constitutional rights of the appellant;  4) the agency did not comply with the Administrative Agencies Practice Act in its proceedings;  5) the agency’s rules or procedures have not afforded the appellant a fair hearing; or 6) the agency’s decision is not in accordance with the law.

 

Id.
 (quoting 
Greenwood v. Moore
, 545 N.W.2d 790, 793 (N.D. 1996)).

[¶7] Kappel contends Officer Vanyo did not have a reasonable and articulable suspicion Kappel was violating the law and thus everything discovered after the stop is inadmissible.  “In order to legally stop a moving vehicle for an investigation, an officer must have a reasonable and articulable suspicion the motorist has violated or is violating the law.”  
City of Fargo v. Ovind
, 1998 ND 69, ¶ 8, 575 N.W.2d 901.  The reasonable suspicion standard must be objective and is based on the totality of the circumstances.  
Id.
  “Reasonable suspicion to justify a stop exists when ‘a reasonable person in the officer’s position would be justified by some objective manifestation to suspect potential criminal activity.’”  
Id.
 (quoting 
State v. Ova
, 539 N.W.2d 857, 859 (N.D. 1995)).  The reasonable suspicion standard is not as exacting as the probable cause standard.  
Id.
  Nevertheless, a mere hunch illegal activity is taking place is not enough to justify the detention of a motorist.  
Salter v. North Dakota Dept. of Transp
., 505 N.W.2d 111, 114 (N.D. 1993).  

[¶8] In assessing reasonableness, we take into account “inferences and deductions an investigating officer would make which may elude a layperson.”  
Ovind
, 1998 ND 69, ¶ 9, 575 N.W.2d 901.  Officers are to assess a “‘situation as it unfolds and, based upon inferences and deductions drawn from their experience and training, make the determination whether all of the circumstances viewed together create a reasonable suspicion of potential criminal activity.’”  
Id.
 (quoting 
Ova
, 539 N.W.2d at 859).

[¶9] Kappel makes two related arguments.  First, Kappel argues that since Officer Vanyo did not see him commit a traffic offense, the stop was not justified.   Second, Kappel argues the stop was unreasonable because there may be innocent reasons for stopping longer than usual at an intersection and for weaving within one’s own lane.  The Supreme Court explained in 
Illinois v. Gates
, 462 U.S. 213, 244 n. 13 (1983):

[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.  By hypothesis, therefore, innocent behavior frequently will provide the basis for a showing of probable cause; to require otherwise would be to 
sub
 
silentio 
impose a drastically more rigorous definition of probable cause than the security of our citizens’ demands. . . .  In making a determination of probable cause the relevant inquiry is not whether particular conduct is “innocent” or “guilty,” but the degree of suspicion that attaches to particular types of noncriminal acts.

This principle applies equally as well to the reasonable suspicion standard.  
United States v. Sokolow
, 490 U.S. 1, 10 (1989).  

[¶10] The reasonable suspicion standard was enunciated in 
Terry v. Ohio
, 392 U.S. 1, 22 (1968), where according to the Supreme Court’s opinion an officer had observed “a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation.”  The Supreme Court said in 
United States v. Sokolow
, “‘there could . . . be circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot.’”  490 U.S. at 9 (quoting 
Reid v. Georgia
, 448 U.S. 438 (1980)).  The Court has also said the process to determine reasonable suspicion “does not deal with hard certainties, but with probabilities.  Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers.”  
United States v. Cortez
, 449 U.S. 411, 418 (1981).  Thus, the reasonable suspicion standard does not require an officer to see a motorist violating a traffic law or to rule out every potential innocent excuse for the behavior in question before stopping a vehicle for investigation.

[¶11] Here, Vanyo articulated two reasons at the administrative hearing for his stop of Kappel:

MR. HOWE:  Okay.  Why . . . what was the basis for you (sic) decision to stop?

OFFICER VANYO:  I factored in the long, extended period he stopped at the stop sign, plus the weaving in the short period of time he was traveling, combination of those two factors.

Vanyo also testified he has made approximately 160 DUI arrests and said Kappel exhibited some of the same behavior as others who were under the influence.  

[¶12] A review of our case law demonstrates  both the pause and the weaving prove significant in a reasonable suspicion analysis.  In 
State v. Guthmiller
, 499 N.W.2d 590, 593 (N.D. 1993) (Levine, J., concurring in the result), a driver’s “prolonged stop” at the stop sign was sufficiently corroborative of an anonymous tip that the driver was under the influence of alcohol to justify the reasonable suspicion stop of the driver.  In 
Guthmiller
, an officer  received an anonymous tip reporting a DUI driver.  
Id.
 at 591.  The anonymous caller described a light blue pickup, the license number, and its eastbound direction on Interstate 94.  
Id.
  The officer observed a light blue pickup exit Interstate 94 and stop at the exit intersection for a prolonged period.  
Id.
  Guthmiller argued that since the officer  saw no erratic driving or violation of the law, there was no reasonable suspicion to justify the stop.  
Id.
  We held that, combined with the tip information, Guthmiller’s “hesitation” at the stop sign was enough to reasonably justify investigation.  
Id.
 at 592.  

[¶13] In a prior decision, we held that a vehicle weaving within its own lane may be enough to justify the stop of that vehicle.  
State v. Dorendorf
, 359 N.W.2d 115, 117 (N.D. 1984).  We have also held that weaving in one’s own lane combined with a minor infraction or other suspicious activity may justify the stop of a vehicle.  
See State v. Goeman
, 431 N.W.2d 290, 291-92 (N.D. 1988) (holding a stop was justified where the car came to an abrupt halt at an intersection and the car later weaved within its own lane); 
Neset v. North Dakota Highway Comm’r
, 388 N.W.2d 860, 862-63 (N.D. 1986) (concluding a stop was justified where the driver weaved “from side to side in its own lane of travel and . . . failed to signal for a right-hand turn”).  
But
 
see
 
Salter
, 505 N.W.2d at 114 (holding that a stop was not justified where a vehicle was traveling 30-35 miles per hour in a 50 mile per hour zone and weaved slightly within its own lane).  

[¶14] In 
Dorendorf
, two officers met an oncoming pickup that was weaving within its own lane.  359 N.W.2d at 116.  The officers turned around and followed the vehicle “for approximately one-eighth to a quarter of a mile.”  
Id.
  They again observed the pickup weaving within its own lane of traffic.  
Id.
  Dorendorf contended that “a smooth continuous weaving within a lane of traffic” does not justify an investigative stop.  
Id.
  We concluded the officers were justified in stopping Dorendorf to determine exactly what was causing the vehicle to weave.  
Id.
 at 117.

[¶15] We also held in 
Goeman
, under facts similar to this case, an investigatory stop was justified.  431 N.W.2d at 291-92.  In 
Goeman
, an officer saw a vehicle stop abruptly at a green light.  
Id.
 at 290.  The officer followed the vehicle and observed the vehicle weave within its own lane, before stopping the vehicle.  
Id.
  Here, Officer Vanyo’s attention was first drawn when Kappel’s vehicle stopped at a stop sign for longer than normal when there was no traffic.  Vanyo followed the vehicle and after he observed the weaving, stopped the vehicle for investigation. 

[¶16] 
Goeman
, 
Dorendorf
 and 
Guthmiller
 present different facts than the instant case as no two cases are exactly alike.  But we see nothing factually in this case to distinguish it from this precedent, nor are we persuaded to abandon it.  

[¶17] Kappel relies on 
Salter
, to support his assertion that weaving within one’s own lane coupled with some other innocent-seeming activity does not justify the stop of a vehicle.  505 N.W.2d at 114.  In 
Salter
, an officer observed Salter’s vehicle traveling 30-35 miles per hour in a 50 mile per hour zone and weaving slightly within its own lane.  
Id.
 at 112.  However, the officer in 
Salter
 “repeatedly characterized the weaving as ‘slight’ or ‘minimum,’ and he apparently did not consider it significant enough to include in his initial written report of the incident.”  
Id.
 at 113.  In contrast, Officer Vanyo referred to the weaving in his initial written report and testified Kappel “made several weaves in a short period of time.”   Vanyo did not characterize the weaving as slight or minimal, but instead, Vanyo said Kappel’s driving was consistent with behavior he has seen exhibited by other drivers who were under the influence.    

[¶18] Kappel’s pause at the intersection also distinguishes this case from 
Salter
.  In 
Salter
, the Department relied on the fact that Salter was not only weaving but was traveling at a slow speed in a no passing zone.  
Id.
 at 113-14.  We found the Department’s conclusion that Salter was impeding traffic was not supported by the facts in the record.  
Id.
 at 114.  The hearing officer found Salter was traveling 30 miles per hour in a 55 mile-per-hour zone.  
Id.
 at 113.  However, the officer’s unrefuted testimony was that Salter was driving 30-35 miles per hour in a 50 mile-

per-hour zone.  
Id.
  We found no evidence in the record as to the length of the no passing zone, or whether there was one, five or ten cars coming up behind Salter.  
Id.
  In contrast, here Officer Vanyo’s unrefuted testimony was that Kappel’s motorcycle paused at a stop sign for an extended period of time.  As our review of 
Guthmiller
 demonstrates, a prolonged pause at an intersection can be an important factor in a reasonable suspicion analysis.  499 N.W.2d at 592.

[¶19] The facts here support the conclusion that a reasonable person in Officer Vanyo’s position would suspect Kappel was intoxicated or otherwise impaired.  Thus, the officer’s investigative stop of Kappel was justified.  We affirm the judgment of the district court affirming the suspension of Kappel’s driving privileges. 

[¶20] Gerald W. VandeWalle, C.J.

Carol Ronning Kapsner

Dale V. Sandstrom

William A. Neumann

Mary Muehlen Maring